220 F.2d 820
 95 U.S.App.D.C. 139
 Alice P. FRIEND, surviving widow of Herbert W. Friend,
deceased employee, Appellant,
v.
Theodore BRITTON, Deputy Commissioner, District of Columbia
Compensation District, et al., Appellees.
 No. 12165.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Jan. 4, 1955.
Decided March 10, 1955.
Petition for Rehearing In Banc Denied April 5, 1955.
 
 [95 U.S.App.D.C. 140] Mr. Henry F. Lerch, with whom Mr. Wilton H. Wallace, Washington, D.C., was on the brief, for appellant.
 Mr. Ward E. Boote, Asst. Sol., U.S. Dept. of Labor, Washington, D.C., with whom Messrs. Leo A. Rover, U.S. Atty., Washington, D.C., and Lewis Carroll, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee Britton.
 [95 U.S.App.D.C. 141] Mr. G. A. Chadwick, Jr., Washington, D.C. with whom Mr. John A. Beck, Washington, D.C., was on the brief, for appellees Harry Alexander, Inc., and Continental Casualty Co.
 Before EDGERTON, PRETTYMAN and FAHY, Circuit Judges.
 FAHY, Circuit Judge.
 
 
 1
 Appellant is the widow of Herbert W. Friend. She appeals from a summary judgment of the District Court granted in favor of the Deputy Commissioner of the District of Columbia Compensation District and his two co-defendants, the employer of her deceased husband and the employer's insurer. She sued these defendants in the effort to have set aside the Deputy Commissioner's order rejecting her claim that the circumstances of her husband's death entitled her to death benefits under the Longshoremen's and Harbor Workers' Compensation Act.[1] The facts were presented to the District Court on the record of two proceedings before the Deputy Commissioner. One had eventuated in an order of March 15, 1951, during Friend's life, awarding him compensation for total and permanent disability, the other led to the order of July 22, 1953, now under review, denying benefits to his widow.
 
 
 2
 Our task is to ascertain whether the Deputy Commissioner's findings are supported by substantial evidence upon the record considered as a whole, O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483, read in light of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456,[2] or are inadequate to support his conclusion. Under these decisions the reviewing court will not sustain the administrative findings merely because they are substantiated by some isolated evidence. Our review must also take account of the settled rule that the Act is to be construed with a view to its beneficent purposes. Doubts, including the factual, are to be resolved in favor of the employee or his dependent family. Fidelity & Casualty Co. of New York v. Burris, 61 App.D.C. 228, 230, 59 F.2d 1042, 1044; Robinson v. Bradshaw, 92 U.S.App.D.C. 216, 206 F.2d 435, certiorari denied, 346 U.S. 899, 74 S.Ct. 226, 98 L.Ed. 400, and cases there cited.
 
 
 3
 One is struck by several salient facts. While at work February 14, 1950, in the reconstructing of the White House, Friend, an electrician, suffered an injury to his abdominal aorta, already weakened by an aneurysm or a predisposition thereto.[3] He ceased work for about a week and then resumed work of lighter character at different locations. On the advice of doctors, however, he discontinued work entirely July 31, 1950. The Deputy Commissioner in a compensation order of March 15, 1951, which was not judicially contested, found the employee had sustained personal injury when subjected to severe and unexpected strain while hurriedly lifting at the White House on February 14, 1950, an article of equipment the weight of which he had underestimated, 'which strain increased the pressure within his abdominal aorta, causing a material aggravation of a preexisting aneurysm of the said vessel', which injury 'arose out of and in the course of the employment'. Friend was found totally and permanently disabled and awarded compensation on that basis.
 
 
 4
 In the order of July 22, 1953, now before us, the Deputy Commissioner again found, on the record of both proceedings,[4][95 U.S.App.D.C. 142] ] that Friend had been totally disabled by the injury at the White House and that his death, on January 17, 1952, resulted from hemorrhage and shock due to rupture of the aneurysm of the abdominal aorta, the very spot of the earlier injury. Nevertheless he denied death benefits. He did this on the basis of findings that the aneurysm preexisted the White House injury, causing a natural and progressive deterioration of the wall of the aorta which culminated in and was the cause of the fatal rupture, and that the White House injury had not hastened this deterioration but, on the contrary, the enforced cessation of work and curtailment of physical activities during his disablement had the beneficial effect of reducing the hazard of an earlier fatal rupture.
 
 
 5
 The case turns on whether the White House injury materially aggravated the diseased aortic condition.[5] During the employee's life it was found to have done so. After his death it is found in the present order, on the basis of the testimony taken at both hearings, that 'the employee continued to be totally disabled as result of' the White House injury 'until the time of his death'. There is also the finding above referred to that the pre-existing disease naturally and unavoidably deteriorated, which it is possible to construe as impliedly finding the White House injury did not aggravate the diseased condition. But to do so would fly in the face of (1) the earlier express finding to the contrary, which was reiterated by (2) the finding in the present order of total disability continuing until death as a result of that injury, and (3) the substantial evidence, considering the whole record, that aggravation had occurred. This evidence includes medical testimony at the last hearing which can support only a conclusion that physical strain or activity by one having an aneurysm of the kind suffered by Friend tends to hasten death. It is true there was some opinion evidence that Friend would have died sooner if the White House injury had aggravated his condition, on the basis of which it was said no aggravation had occurred. But the Deputy Commissioner resolved the issue of aggravation by finding again that the injury was a disabling one within the meaning of the Act; that is, as explicitly found in his order of March 15, 1951, that it had materially aggravated the diseased condition. It was hardly possible to conclude otherwise in view of the virtually uniform opinion of doctors that the cessation, beginning August 1, 1950, of physical exertion, stress or strain, tended to lengthen Friend's life. It follows as hereinafter more fully discussed that the unusual physical strain at the White House in February, 1950, not to mention the employee's work activity thereafter which did not entirely cease until August 1, 1950, tended to shorten his life. We must take as established, therefore, that the White House injury materially aggravated the diseased condition of the aorta and that the disabling effect of the injury continued until death. And there can be no question the aggravation constituted an accidental injury within the meaning of the Act.[6] Robinson v. Bradshaw, supra; Hoage v. Employers' Liability Assur. Corporation, note 5, supra; Commercial Casualty Ins. Co. v. Hoage, 64 App.D.C. 158, 75 F.2d 677, certiorari denied, 295 U.S. 733, 55 [95 U.S.App.D.C. 143] S.Ct. 645, 79 L.Ed. 1682; Grain Handling Co. v. Sweeney, 2 Cir., 102 F.2d 464, certiorari denied Grain Handling Co. v. McManigal, 308 U.S. 570, 60 S.Ct. 83, 84 L.Ed. 478.
 
 
 6
 Proceeding on the foregoing basis it will be seen that the finding of the Deputy Commissioner that the fatal rupture of the diseased area was due to a natural and progressive deterioration of the aorta wall cannot be accepted. On February 14, 1950, an aggravating injury was superimposed upon the diseased condition of the aorta and until death added its injurious effect to what otherwise might have been a natural, progressive or unavoidable course of deterioration. The ultimate conclusion that death was not causally related to the injury is thus deprived of one of its two express premises.[7]
 
 
 7
 The other premise of the conclusion, interwoven with the one just discussed, is that 'the enforced cessation of work and curtailment of all physical activities during his disablement' had the beneficial effect of reducing 'the hazard of earlier fatal rupture', and therefore the death was not hastened by the injury. The testimony underlying this premise is that the inactivity which began August 1, 1950, lengthened Friend's life as compared with its expectancy at that time. As one doctor replied, 'any inactivity of that type would certainly lengthen his life' when asked 'if, as a result of the incident of February 14, 1950,' he gave up 'his active duty as an electrician as of August 1, 1950.' As another said, the less active a patient is who has an aneurysm 'certainly it tends to lengthen his life.' Still another said that part of the treatment of an aneurysm is to prevent any undue stress or strain in order to 'lessen the chances of an early termination, early rupture.' Of course none of this is evidence that the February injury in and of itself tended to or did lengthen Friend's life, but that the enforced inactivity which began August 1, 1950, did so from that time forward in the condition he then found himself. Before August arrived, however, the February injury had begun to shorten Friend's life. The uniform medical testimony attributes a lengthening of life to physical inactivity of one in his condition. If this view is accepted, as it was by the Deputy Commissioner, the unusual physical strain which precipitated the White House injury, and the work, though lighter, which except for one week continued thereafter until August 1st, shortened Friend's life. There is no need to speculate whether the injury and work activity shortened his life less in point of time than the inactivity lengthened it. The two influences do not operate in parallel time paths to be compared in this manner. The injury had begun to shorten Friend's life span before the inactivity began. The shortening could not be erased except by a cure of the injury, which did not occur. Until the end the Deputy Commissioner found that the injury continued to disable the employee. Necessarily, then, the deterioration of the wall of the aorta was hastened by the injury toward the fatal rupture, though the inactivity beginning in August slowed down the rate of progress towards death. We think this is the meaning of the evidence that the enforced inactivity tended to lengthen Friend's life. We may add that the beneficial effect of this enforced inactivity was not causally related to the injury but to the retirement of the employee from work in the effort to mitigate or overcome the progress of his disease and the effect of the injury. Had his efforts effected a cure there would have been no death from the weakened aorta and a fortiori no compensable death by reason of the injury; so, too, even though the aneurysm were [95 U.S.App.D.C. 144] not cured if death had resulted from another cause. See Hartford Accident & Indemnity Co. v. Cardillo, 72 App.D.C. 52, 58, 112 F.2d 11, 17, certiorari denied, 310 U.S. 649, 60 S.Ct. 1100, 84 L.Ed. 1415. But the fact is death resulted from the aortic condition, the deterioration of which until it fatally ruptured was partially caused by the accidental injury found by the Deputy Commissioner to have disabled Friend until his death.
 
 
 8
 There have been two hearings involving the controlling features of this case. A third is not required. Our duty now is to give such directions as will enable the Commissioner to dispose of the case. The evidence as a whole, which we have carefully examined, and the findings of the Deputy Commissioner of the pre-existing aneurysm and the White House injury which aggravated that diseased condition, require the conclusion that this accidental injury hastened the deterioration of the weakened wall of the aorta toward the fatal rupture. This is so notwithstanding that the employee's inactivity beginning August 1, 1950, enforced by the injured condition, tended thenceforth to extend his life span beyond what it would have been had he continued a more active life. Since, in addition, the injury arose out of and in the course of employment, the death of the employee comes within the compensable provisions of the Act. 'To hasten death is to cause it.' Avignone Freres, Inc., v. Cardillo, 73 App.D.C. 149, 150, 117 F.2d 385, 386.
 
 
 9
 The judgment of the District Court accordingly will be reversed and the case remanded with directions for its remand to the Deputy Commissioner for an appropriate award in accordance with this opinion.
 
 
 10
 Reversed and remanded.
 
 
 11
 EDGERTON, Circuit Judge (dissenting in part).
 
 
 12
 Though the record does not support the Deputy Commissioner's finding that the accident did not cause death, I think it does not require a finding that the accident did cause death. If an accident causes both deterioration which shortens life and inactivity which lengthens life, I think the accident does not cause death unless the deterioration shortens life more than the inactivity lengthens it. I would remand the case to the Deputy Commissioner for new findings.
 
 
 
 [1]
 Hereinafter referred to as the Act, 44 Stat. 1424 et seq., as amended, 33 U.S.C.A. § 901 et seq., made applicable to the District of Columbia by § 36-501, D.C.Code 1951
 
 
 [2]
 For subsequent history see National Labor Relations Board v. Universal Camera Corp., 2 Cir., 190 F.2d 429
 
 
 [3]
 Whether or not this pre-existing condition was actually an aneurysm of the aorta, as the Commissioner found, or a predisposition to or suspicion of such an aneurysm, is not altogether clear from the evidence. But uncertainty in this regard is immaterial since in any event there was a pre-existing diseased condition
 
 
 [4]
 The order of March 15, 1951, was incorporated by reference into the order of July 22, 1953. Moreover, as previously stated, the present order was made on the basis of the facts adduced at the earlier as well as at the later hearing.'
 
 
 [5]
 'It is the universal holding of the courts in compensation cases that the fact that an employee is diseased does not bar his right to recover for accidental injury notwithstanding, except for such diseased condition, the injury would not have occurred.' Hoage v. Employers' Liability Assur. Corporation, 62 App.D.C. 77, 79, 64 F.2d 715, 717, certiorari denied sub nom. Employers' Liability Assurance Corporation v. Kerper, 290 U.S. 637, 54 S.Ct. 54, 78 L.Ed. 554
 
 
 [6]
 The term 'injury' is defined as 'accidental injury or death arising out of and in the course of employment'. 33 U.S.C.A. § 902(2)
 
 
 [7]
 Furthermore, the record shows that the testimony which hypothetically dissociates the injury, assuming it aggravated the diseased condition, from the death, is that of doctors who held the opinion, hereinabove referred to, that no aggravating injury had in fact occurred, contrary to the findings of the Deputy Commissioner